# Exhibit B

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| TASSYA DIANTI PUTERI, as Special Administrator of the ESTATE OF YUNINGTYAS UPIEK KARTIKAWATI, Deceased | ) ) ) ) | 5525060 |
| | ) | CIVIL ACTION No. 2019L006951 |
| Plaintiff, | ) ) | |
| v. | ) ) | JURY TRIAL DEMANDED |
| THE BOEING COMPANY, XTRA AEROSPACE, INC., WENCOR GROUP, L.L.C., ROSEMOUNT AEROSPACE, INC., COLLINS AEROSPACE, and UNITED TECHNOLOGIES CORPORATION | ) ) ) ) ) | FILED 6/24/2019 12:08 PM DOROTHY BROWN CIRCUIT CLERK COOK COUNTY, IL 2019L006951 |
| Defendants. | | |

### COMPLAINT AT LAW AND JURY DEMAND

NOW COMES the Plaintiff, TASSYA DIANTI PUTERI, as Special Administrator of the ESTATE OF YUNINGTYAS UPIEK KARTIKAWATI, by and through her undersigned attorneys, complaining against Defendants, THE BOEING COMPANY, XTRA AEROSPACE INC., WENCOR GROUP LLC., ROSEMOUNT AEROSPACE, INC., COLLINS AEROSPACE, UNITED TECHNOLOGIES CORPORATION, and states as follows:

### Introduction: The Plane Crash

At dawn, an aircraft departed from Soekarno–Hatta International Airport in Tangerang, Indonesia. Shortly after the aircraft departed, the aircraft took a steep dive and plunged into the Java Sea. The crash resulted in the death of 189 occupants of the aircraft in what is now remembered as one of Indonesia's most horrific tragedies.

FILED DATE: 6/24/2019 12:08 PM   2019L006951

## The Parties

1. At all times relevant hereto, the Decedent, YUNINGTYAS UPIEK KARTIKAWATI was an individual residing in Indonesia.

2. At all times relevant hereto, Plaintiff TASSYA DIANTI PUTERI was an individual residing in Indonesia. Plaintiff was the decedent's daughter.

3. Defendant, The Boeing Company, is a corporation headquartered in Chicago, Illinois.

4. Defendant, XTRA Aerospace, Inc. is a maintenance/repair facility headquartered in Miramar, Florida.

5. Defendant, Wencor Group LLC is corporation headquartered in Peachtree, Georgia.

6. Defendant, Rosemount Aerospace Inc. is a corporation headquartered in Burnsville, Minnesota.

7. Defendant, Collins Aerospace is a corporation headquartered in Charlotte, North Carolina.

8. Defendant, United Technologies Corporation is a corporation headquartered in Farmington, Connecticut.

## Factual Background

### A. *Introduction*

9. This lawsuit arises out of the tragic aircraft crash that occurred in Indonesia on October 29, 2018 which resulted in the death of YUNINGTYAS UPIEK KARTIKAWATI and 188 others. The aircraft involved in the incident was operated by PT Lion Mentari Airlines, d/b/a Lion Air.

10. The aircraft involved in this incident was a Boeing 737 Max 8, serial number 21816,

FILED DATE: 6/24/2019 12:08 PM  2019L006951

line number 7058, registered as PK-LQP ("the incident aircraft") and was manufactured, designed, marketed and distributed by The Boeing Company in the United states.

11. The incident aircraft is a new model of Defendant Boeing's 737 line of aircraft, the Boeing 737 Max 8. The Boeing 737 Max 8 model was entered into service by Defendant Boeing on May 22, 2017. This aircraft crash is the first crash involving a Boeing 737 Max 8.

12. Through information and belief, the incident aircraft was leased from CMIG Aviation Capital and delivered new to Defendant Lion Air on August 13, 2018. By the time that the incident occurred, the aircraft had flown only 800 hours in service. The Boeing 737 Max 8 was brand new and should have never crashed.

**B. *The Plane Crash***

13. On October 29, 2018, the decedent, YUNINGTYAS UPIEK KARTIKAWATI boarded Lion Air Flight JT610 for a scheduled trip from Tangerang to Pangkal Pinang, Indonesia.

14. There was a total of 189 occupants aboard Lion Air Flight JT610, including 181 passengers and 8 Lion Air Employees (two Lion Air Pilots and six Lion Air cabin crew members).

15. At approximately 6:21 a.m. local time in Indonesia, Lion Air Flight JT610 departed Soekarno–Hatta International Airport in Tangerang, Indonesia. After descending, the aircraft was at an altitude of about 5,000 feet in the air when the aircraft started experiencing difficulties as the aircraft's speed and altitude was erratic. In response, the Lion Air crew contacted air traffic controllers to request a return to the airport. However, instead of turning back to the airport, the aircraft banked to the left and made a significant altitude shift as it dropped sharply. By 6:32 a.m., communications with the plane had ceased as the aircraft had taken a steep dive and plummeted to the Java Sea below with so much force that the metal fixtures of the aircraft disintegrated.

FILED DATE: 6/24/2019 12:08 PM 2019L006951

16. The crash resulted in the death of all 189 occupants of the aircraft, including YUNINGTYAS UPIEK KARTIKAWATI.

**C.** *Cause of the Plane Crash*

17. Through information and belief, a malfunctioning flight control system fed widely divergent readings to the pilot and co-pilot of flight JT610. The Lion Air cockpit then failed to respond appropriately to the conflicting data and triggered an automated safety system that caused the plane to take a steep dive. This flight control system is what resulted in the incident aircraft plummeting to the Java Sea.

18. The "black box" data recorded from the incident aircraft illustrated that the aircraft's last four flights all had airspeed indicator problems. The airspeed is measured from so-called pitot tubes in the nose of the aircraft. Airspeed indicator malfunctions can confuse pilots on how to respond, can cause disorientation and even loss of control.

19. Another aircraft system that is related to the airspeed indicating system is the plane's angle of attack sensors ("AOA Sensor"). The sensors are instruments on the aircraft's exterior which gauge the angle of incoming winds as the winds come across the aircraft. The sensors help determine whether the plane might be stalling and if the aircraft's computers detect a stall, the sensors can trigger electric motors that cause the tail to rise and the nose to pitch downward without pilot instruction.

20. These two systems are what allow speed values to be relayed to both the pilot and co-pilot in separate indicators in the cockpit. Through information and belief, the divergent readings from the malfunctioning flight control system triggered the electric motors of the AOA Sensor and caused the aircraft to plummet downward, crashing into the ocean.

21. Lion Air engineers, technicians and maintenance staff attempted to address the airspeed

FILED DATE: 6/24/2019 12:08 PM 2019L006951

indicating problems several times before the incident. This included working on the pitot tubes and replacing the AOA sensor the night before the fatal flight.

### D. The Boeing Company

22. The Boeing Company failed to warn of a malfunction defect that can occur with the Boeing 737 Max 8's new AOA Sensor safety feature. The Boeing Company failed to warn of the potential risks of a scenario which would make the aircraft uncontrollable without correct inputs. The Boeing company did not provide a warning about this defect in their aircraft's flight manual or any trainings and did not warn the public about the defect until after this tragedy had already occurred.

23. On November 7, 2018, the Federal Aviation Administration issued Emergency Airworthiness Directive (AD) 2018-23-51 to all owners and operators of The Boeing Company Model 737-8 and -9 airplanes, finding as follows:

> This emergency AD was prompted by analysis performed by the manufacturer showing that if an erroneously high single angle of attack (AOA) sensor input is received by the flight control system, there is a potential for repeated nose-down trim commands of the horizontal stabilizer. *This condition, if not addressed, could cause the flight crew to have difficulty controlling the airplane, and lead to excessive nose-down attitude, significant altitude loss, and possible impact with terrain.*[1]

24. This is precisely what caused this preventable crash to occur.

---

[1] *See* Emergency Airworthiness Directive # 2018-23-51, November 7, 2018, available at http://rgl.faa.gov/Regulatory_and_Guidance_Library/rgad.nsf/0/83ec7f95f3e5bfbd8625833e0070a070/$FILE/2018-23-51_Emergency.pdf (last visited Nov. 24, 2018) (emphasis added).

FILED DATE: 6/24/2019 12:08 PM   2019L006951

### E. Rosemount Aerospace, Collins Aerospace, UTC

25. Based upon information and belief, Rosemount is the aerospace components manufacturer that produced the faulty sensor on the Lion Air 737 Max. Rosemount is a division of Collins Aerospace, which is a subsidiary of United Technologies Corporation (hereinafter Defendants Rosemount Aerospace, Collins Aerospace and United Technologies Corporation will be referred to collectively as "Rosemount"). The sensor used in the Boeing 737 Max 8 was made at the Rosemount Aerospace facility in Minnesota and placed into the Lion Air 737 Max. If the Angle-of Attack sensor was developed properly and without fault, the plane would not have attempted to over-correct itself by nose diving into the Java Sea.

### F. XTRA Aerospace and Wencor Group

26. Based upon information and belief, XTRA Aerospace, a subsidiary of Wencor Group, (hereinafter referred to collectively as "XTRA Aerospace") performed maintenance and/or repairs to the sensor(s) and/or component parts of the plane which caused or contributed to the over-correct, shortly before the incident referenced in this complaint.

### CLAIMS FOR RELIEF

### COUNT I: WRONGFUL DEATH – STRICT LIABILITY
### DESIGN DEFECT BY DEFENDANT THE BOEING COMPANY

27. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

28. Defendant, The Boeing Company, had a duty to place into the stream of commerce, manufacture, assemble, supply, distribute market, promote, and/or sell the aforementioned aircraft and/or related component parts used therein in the course of its business that were reasonable fit, suitable and safe for its intended or reasonably foreseeable use for which it was designed,

FILED DATE: 6/24/2019 12:08 PM 2019L006951

manufactured, distributed, marketed and sold.

29. The Boeing Company was also responsible for after-market support for the aircraft, the provision of technical manuals for the operation and maintenance of the aircraft.

30. The Boeing Company developed the specifications for the performance and reliability of the flight control system, pitot tubes and AOA Sensors of the aircraft.

31. At all material times, The Boeing Company held a Type Certificate and Production Authority issued by the FAA for the aircraft.

32. At the time the aforesaid aircraft, its related component parts used therein, and the Aircraft Flight Manual prepared and provided by The Boeing company, left the possession of The Boeing Company and entered the stream of commerce, the aforesaid aircraft its related component parts used therein, and the Aircraft Flight Manual were in a defective condition and unreasonably dangerous when it left Defendant's custody and control. The aforesaid aircraft, its related component parts used therein, and the Aircraft Flight Manual were not reasonably fit, suitable and safe for its intended or reasonably foreseeable uses. These defects include but are not limited to the following:

a.  The aforesaid aircraft contained a flight control system that failed to filter out erroneous information, including information about the aircraft's angle of attack;

b.  The aforesaid aircraft contained a flight control system with event sensors that were subject to becoming blocked and/or obstructed causing them to provide erroneous information about the aircraft's angle of attack;

c.  The aforesaid aircraft contained a flight control system that had event sensors that erroneously reported a high angle of attack, which caused an unauthorized

FILED DATE: 6/24/2019 12:08 PM 2019L006951

command and without notice to the flight crew, a nose down movement of the aircraft;

d.   The aforesaid aircraft's flight control system feature that commanded unauthorized dangerous downward maneuver of the aircraft did not allow flight crew adequate time or method to respond and/or override an incorrect downward command initiated by the aircraft flight control system;

e.   The aforesaid aircraft as designed, did not provide a method or means by which to correct improperly-commanded downward movements initiated by the aircraft's flight control system thus not allowing the flight crew a means to timely and safely recover control of the aircraft;

f.   The Aircraft Flight Manual prepared and provided by The Boeing Company for the aforesaid aircraft failed to provide sufficient instructions or procedures to be followed to properly, timely, and safely correct an improper downward nose movement command that would allow flight crew to recover control of the aforesaid aircraft, to alert of the dangers the aircraft's flight control system posed and to give the information necessary to avoid or mitigate those dangers

g.   The Aircraft Flight Manual prepared and provided by The Boeing Company for the aforesaid aircraft did not warn of the dangers associated with the flight control system, its sensors, and its feature that commanded an unauthorized dangerous downward maneuver of the aircraft;

h.   The Aircraft Flight Manual failed to provide proper training to handle this type of emergency to its captains and pilots;

FILED DATE: 6/24/2019 12:08 PM 2019L006951

33. The aforesaid aircraft was used in a manner reasonably anticipated by the Defendant by the Decedent, YUNINGTYAS UPIEK KARTIKAWATI.

34. The Decedent, YUNINGTYAS UPIEK KARTIKAWATI, could not have discovered any defect in the aforementioned aircraft through the exercise of due care.

35. The Boeing Company as designer, manufacturer, marketer, and distributor of aircraft devices is held to the level of knowledge of an expert in their field.

36. As a direct and proximate result of the design defects in the Boeing 737 Max 8, including, but not limited to its AOA Sensor safety feature, the incident plane crashed causing the death of all persons onboard the aircraft, including Plaintiff's decedent, YUNINGTYAS UPIEK KARTIKAWATI.

37. TASSYA DIANTI PUTERI, as Special Administrator of the Estate of YUNINGTYAS UPIEK KARTIKAWATI, brings this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180 et seq. on behalf of YUNINGTYAS UPIEK KARTIKAWATI's next of kin.

**WHEREFORE**, Plaintiff TASSYA DIANTI PUTERI, as Special Administrator of the Estate of YUNINGTYAS UPIEK KARTIKAWATI prays for judgment in her favor and against the Defendant, THE BOEING COMPANY, in a sum in excess of the jurisdictional limits of this Court, together with interest and costs of this action.

### COUNT II: WRONGFUL DEATH – STRICT LIABILITY MANUFACTURING DEFECT BY DEFENDANT THE BOEING COMPANY

38. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

FILED DATE: 6/24/2019 12:08 PM   2019L006951

39. At all times relevant, it was the duty of The Boeing Company to manufacture and produce the aforementioned aircraft and/or related component parts used therein in a manner such that is would be reasonably safe for its intended or reasonably foreseeable use.

40. The Boeing Company failed to manufacture and/or produce the aforementioned aircraft and/or related component parts used therein according to its design specifications.

41. The Boeing Company failed to manufacture and/or produce the aforementioned aircraft and/or related component parts used therein according to its design specifications and/or performance standards.

42. The Boeing Company's failure to manufacture and/or produce the aforementioned aircraft and/or related component parts used therein according to its design specifications and/or performance standards made the aforementioned aircraft and/or related component parts used therein not reasonably safe for its intended or reasonably foreseeable uses.

43. The manufacturing defect with the aforementioned aircraft and/or related component parts used therein existed before it left the custody, control and possession of The Boeing Company.

44. At the time The Boeing Company marketed, sold, and/or distributed the aforementioned aircraft and/or related component parts used therein, the Decedent, YUNINGTYAS UPIEK KARTIKAWATI was a foreseeable user and used the aforementioned aircraft and/or related component parts used therein for its intended purpose.

45. The aforementioned aircraft and/or related component parts used therein were not altered in any way subsequent to leaving The Boeing Company's possession and prior to use by the Decedent, YUNINGTYAS UPIEK KARTIKAWATI.

FILED DATE: 6/24/2019 12:08 PM  2019L006951

46. The Decedent, YUNINGTYAS UPIEK KARTIKAWATI could not have discovered any defect in the aforementioned aircraft and/or related component parts used therein through exercise of due care.

47. As a direct and proximate result of the manufacturing defects in the Boeing 737 Max 8, including, but not limited to its AOA Sensor safety feature, the incident plane crashed causing the death of all persons onboard the aircraft, including Plaintiff's decedent, YUNINGTYAS UPIEK KARTIKAWATI.

48. TASSYA DIANTI PUTERI, as Special Administrator of the Estate of YUNINGTYAS UPIEK KARTIKAWATI, brings this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180 et seq. on behalf of YUNINGTYAS UPIEK KARTIKAWATI's next of kin.

**WHEREFORE**, Plaintiff TASSYA DIANTI PUTERI, as Special Administrator of the Estate of YUNINGTYAS UPIEK KARTIKAWATI prays for judgment in her favor and against the Defendant, THE BOEING COMPANY, in a sum in excess of the jurisdictional limits of this Court, together with interest and costs of this action.

### COUNT II: WRONGFUL DEATH – STRICT LIABILITY
### FAILURE TO WARN BY DEFENDANTS THE BOEING COMPANY

49. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

50. At all relevant times, Defendants knew or should have known that the incident aircraft was defective and unreasonably dangerous.

51. At all relevant times, consumers, including Decedent, YUNINGTYAS UPIEK KARTIKAWATI, were not aware of the unreasonably dangerous condition that existed in the incident aircraft.

FILED DATE: 6/24/2019 12:08 PM 2019L006951

52. At all relevant times, Defendant owed a duty to warn consumers, including Decedent, YUNINGTYAS UPIEK KARTIKAWATI, of unreasonably dangerous conditions it knew or should have known may cause harm without adequate warning or instruction.

53. Defendant breached this duty in one or more of the following ways;

    a.    Failed to warn consumers of known defects that could occur with the Boeing 737 Max 8's AOA Sensor safety feature.

    b.    Failed to warn of the potential risks of a scenario which would make the 737 MAX 8 uncontrollable without correct inputs.

    c.    Failed to provide warnings about known defects in the 737 MAX 8 in their aircraft's flight manual or in any trainings.

54. As a direct and proximate result of the Defendant's failure to warn, Decedent YUNINGTYAS UPIEK KARTIKAWATI and others were not able to reasonably appreciate the known defects of the incident aircraft.

55. As a direct and proximate result of the Defendant's failure to warn, Decedent YUNINGTYAS UPIEK KARTIKAWATI suffered fatal injuries when the incident aircraft crashed.

56. TASSYA DIANTI PUTERI, as Special Administrator of the Estate of YUNINGTYAS UPIEK KARTIKAWATI, brings this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180 et seq. on behalf of YUNINGTYAS UPIEK KARTIKAWATI's next of kin.

**WHEREFORE**, Plaintiff TASSYA DIANTI PUTERI, as Special Administrator of the Estate of YUNINGTYAS UPIEK KARTIKAWATI prays for judgment in her favor and against the Defendant, THE BOEING COMPANY, in a sum in excess of the jurisdictional limits of this Court, together with interest and costs of this action.

## COUNT IV: WRONGUFL DEATH – NEGLIGENCE BY DEFENDANT
## THE BOEING COMPANY

57. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

58. Defendant designed, manufactured, assembled, supplied, distributed, or sold the aforementioned aircraft and/or related component parts, including the engine, in its course of business.

59. Defendant held itself out as an entity which could carefully and competently design, manufacture, select materials for, design maintenance programs for, inspect, supply, distribute, and sell aircraft for use in interstate and international commerce.

60. At all relevant times, Defendant knew or through the exercise of reasonable care should have known, that the incident aircraft was defective and dangerous when used in the foreseeable manner for which it was marketed and sold.

61. Defendant had the duty to use that degree of care that an ordinarily careful and prudent aircraft designer, manufacturer, and seller of aircraft and component parts would use under the same or similar circumstances.

62. In breach of this duty, Defendant failed to use reasonable care and skill in the design, manufacture, marketing and distribution of the plane and/or its component parts including the selection of the flight control system, airspeed indicators, pitot tubes, AOA Sensors.

63. Defendant was negligent in one or more of the following ways:

    a.      failing to use reasonable care and skill in the design, manufacture and testing of the incident aircraft;

    b.      failing to use reasonable care and skill in the establishment of standards and

FILED DATE: 6/24/2019 12:08 PM   2019L006951

specifications for the performance and reliability of the engines;

c.   failing to adequately test and monitor the reliability of the engines;

d.   failing to adequately investigate and inform operators of the aircraft of prior instances of engine malfunction and failure;

e.   negligently designed, manufactured, assembled, and sold the aforesaid aircraft such that it contained a flight control system that failed to filter out erroneous information, including information about the aircraft's angle of attack;

f.   negligently designed, manufactured, assembled, and sold the aforesaid aircraft such that it contained a flight control system with event sensors that were subject to becoming blocked and/or obstructed causing them to provide erroneous information about the aircraft's angle of attack;

g.   negligently designed, manufactured, assembled, and sold the aforesaid aircraft such that it contained a flight control system that had event sensors that erroneously reported a high angle of attack, which caused an unauthorized command and without notice to the flight crew, a nose down movement of the aircraft;

h.   negligently designed, manufactured, assembled, and sold the aforesaid aircraft such that it's flight control system feature that commanded unauthorized dangerous downward maneuver of the aircraft did not allow flight crew adequate time or method to respond and/or override an incorrect downward command initiated by the aircraft flight control system;

i.   negligently designed, manufactured, assembled, and sold the aforesaid aircraft such that subject aircraft did not provide a method or means by which to correct

FILED DATE: 6/24/2019 12:08 PM   2019L006951

improperly-commanded downward movements initiated by the aircraft's flight control system thus not allowing the flight crew a means to timely and safely recover control of the aircraft;

j.      negligently prepared and provided Aircraft Flight Manual for the aforesaid aircraft that failed to provide sufficient instructions or procedures to be followed to properly, timely, and safely correct an improper downward nose movement command that would allow flight crew to recover control of the aforesaid aircraft, to alert of the dangers the aircraft's flight control system posed and to give the information necessary to avoid or mitigate those dangers

k.      negligently prepared and provided the Aircraft Flight Manual for the aforesaid aircraft that did not warn of the dangers associated with the flight control system, its sensors, and its feature that commanded an unauthorized dangerous downward maneuver of the aircraft;

l.      negligently prepared and provided the Aircraft Flight Manual that failed to provide proper training to handle this type of emergency to its captains and pilots;

m.      negligently provided or failed to provide proper training and adequate instruction to the subject aircraft's flight crews to handle this type of emergency and to respond to improperly commanded downward movement of the aircraft triggered by its flight control system;

n.      negligently failed to warn of the above-defects in the subject aircraft; and

o.      negligently provided or failed to provide proper and adequate after-sale warning, instructions and/or advise as to the maintenance and repair of the

subject aircraft;

64. As a direct and proximate result of one or more of the forgoing negligent acts or omissions of The Boeing Company, the subject aircraft crashed, causing fatal injuries to all onboard, including, Decedent YUNINGTYAS UPIEK KARTIKAWATI.

65. TASSYA DIANTI PUTERI, as Special Administrator of the Estate of YUNINGTYAS UPIEK KARTIKAWATI, brings this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180 et seq. on behalf of YUNINGTYAS UPIEK KARTIKAWATI's next of kin.

**WHEREFORE**, Plaintiff TASSYA DIANTI PUTERI, as Special Administrator of the Estate of YUNINGTYAS UPIEK KARTIKAWATI prays for judgment in her favor and against the Defendant, THE BOEING COMPANY, in a sum in excess of the jurisdictional limits of this Court, together with interest and costs of this action.

## COUNT IV: WRONGUFL DEATH – NEGLIGENCE BY DEFENDANTS XTRA AEROSPACE AND WENCOR GROUP

66. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

67. Defendants repaired, assembled, supplied, distributed, or sold the aforementioned aircraft and/or related component parts, including the engine and sensor, in its course of business.

68. Defendants held itself out as an entity which could carefully and competently repair, select materials for, design maintenance programs for, inspect, supply, distribute, and sell aircraft and/or related component parts for use in interstate and international commerce.

69. At all relevant times, Defendants knew or through the exercise of reasonable care should have known, that the incident aircraft and/or related component parts were defective and dangerous when used in the foreseeable manner for which it was marketed and sold.

FILED DATE: 6/24/2019 12:08 PM   2019L006951

70. Defendants had the duty to use that degree of care that an ordinarily careful and prudent aircraft maintenance and/or repair facility and seller of aircraft component parts would use under the same or similar circumstances.

71. In breach of this duty, Defendants failed to use reasonable care and skill in the repair, maintenance, and/or distribution of the plane component parts including the selection of the flight control system, airspeed indicators, pitot tubes, AOA Sensors.

72. Defendants were negligent in one or more of the following ways:

a. failing to use reasonable care and skill in the repair and/or maintenance of the incident aircraft and/or related component parts;

b. failing to use reasonable care and skill in the establishment of standards and specifications for the performance and reliability of the engines and/or related component parts;

c. failing to adequately test and monitor the reliability of the engines and/or related component parts;

d. failing to adequately investigate and inform operators of the aircraft of prior instances of engine malfunction and failure;

e. negligently repaired, maintained, and/or sold the aircraft related component parts such that the event sensors were subject to becoming blocked and/or obstructed causing them to provide erroneous information about the aircraft's angle of attack;

f. negligently repaired, maintained, and/or sold the aircraft related component parts such that the event sensors erroneously reported a high angle of attack, which caused an unauthorized command and without notice to the flight crew,

a nose down movement of the aircraft;

g.   negligently repaired, maintained, and/or sold the aircraft related component parts such that its flight control system feature that commanded unauthorized dangerous downward maneuver of the aircraft did not allow flight crew adequate time or method to respond and/or override an incorrect downward command initiated by the aircraft flight control system;

h.   negligently repaired, maintained, and/or sold the aforesaid aircraft and/or related component parts such that subject aircraft did not provide a method or means by which to correct improperly-commanded downward movements initiated by the aircraft's flight control system thus not allowing the flight crew a means to timely and safely recover control of the aircraft;

i.   negligently failed to warn of the above-defects in the subject aircraft related component parts; and

j.   negligently provided or failed to provide proper and adequate after-sale warning, instructions and/or advise as to the maintenance and repair of the subject aircraft and/or related component parts.

73. As a direct and proximate result of one or more of the forgoing negligent acts or omissions of the XTRA Aerospace Defendants, the subject aircraft crashed, causing fatal injuries to all onboard, including, Decedent YUNINGTYAS UPIEK KARTIKAWATI.

74. TASSYA DIANTI PUTERI, as Special Administrator of the Estate of YUNINGTYAS UPIEK KARTIKAWATI, brings this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180 et seq. on behalf of YUNINGTYAS UPIEK KARTIKAWATI's next of kin.

FILED DATE: 6/24/2019 12:08 PM  2019L006951

**WHEREFORE**, Plaintiff TASSYA DIANTI PUTERI, as Special Administrator of the Estate of YUNINGTYAS UPIEK KARTIKAWATI prays for judgment in her favor and against the XTRA Aerospace Defendants, in a sum in excess of the jurisdictional limits of this Court, together with interest and costs of this action.

## COUNT II: WRONGFUL DEATH – STRICT LIABILITY MANUFACTURING DEFECT BY DEFENDANTS ROSEMOUNT

75. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

76. At all times relevant, it was the duty of the Rosemount Defendants to manufacture and produce the aforementioned sensor and/or related component parts used therein in a manner such that is would be reasonably safe for its intended or reasonably foreseeable use.

77. Rosemount failed to manufacture and/or produce the aforementioned sensor and/or related component parts used therein according to its design specifications.

78. Rosemount failed to manufacture and/or produce the aforementioned sensor and/or related component parts used therein according to its design specifications and/or performance standards.

79. Rosemount's failure to manufacture and/or produce the aforementioned sensor and/or related component parts used therein according to its design specifications and/or performance standards made the aforementioned aircraft and/or related component parts used therein not reasonably safe for its intended or reasonably foreseeable uses.

80. The manufacturing defect with the aforementioned sensor and/or related component parts used therein existed before it left the custody, control and possession of Rosemount Aerospace.

FILED DATE: 6/24/2019 12:08 PM 2019L006951

81. At the time Rosemount marketed, sold, and/or distributed the aforementioned sensor and/or related component parts used therein, the Decedent, YUNINGTYAS UPIEK KARTIKAWATI was a foreseeable user and used the aforementioned aircraft and/or related component parts used therein for its intended purpose.

82. The aforementioned sensor and/or related component parts used therein were not altered in any way subsequent to leaving Rosemount Aerospace's possession and prior to use by the Decedent, YUNINGTYAS UPIEK KARTIKAWATI.

83. The Decedent, YUNINGTYAS UPIEK KARTIKAWATI could not have discovered any defect in the aforementioned sensor and/or related component parts used therein through exercise of due care.

84. As a direct and proximate result of the manufacturing defects in the Boeing 737 Max 8, including, but not limited to its AOA Sensor safety feature, the incident plane crashed causing the death of all persons onboard the aircraft, including Plaintiff's decedent, YUNINGTYAS UPIEK KARTIKAWATI.

85. TASSYA DIANTI PUTERI, as Special Administrator of the Estate of YUNINGTYAS UPIEK KARTIKAWATI, brings this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180 et seq. on behalf of YUNINGTYAS UPIEK KARTIKAWATI's next of kin.

**WHEREFORE**, Plaintiff TASSYA DIANTI PUTERI, as Special Administrator of the Estate of YUNINGTYAS UPIEK KARTIKAWATI prays for judgment in her favor and against the Rosemount Defendants, in a sum in excess of the jurisdictional limits of this Court, together with interest and costs of this action.

FILED DATE: 6/24/2019 12:08 PM   2019L006951

## COUNT IV: WRONGUFL DEATH – NEGLIGENCE BY DEFENDANTS ROSEMOUNT

86. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

87. Defendants designed, manufactured, assembled, supplied, distributed, or sold the aforementioned aircraft sensor and/or related component parts in its course of business.

88. Defendants held itself out as an entity which could carefully and competently design, manufacture, select materials for, design maintenance programs for, inspect, supply, distribute, and sell sensors for aircraft to be used in interstate and international commerce.

89. At all relevant times, Defendants knew or through the exercise of reasonable care should have known, that the incident sensor was defective and dangerous when used in the foreseeable manner for which it was marketed and sold.

90. Defendants had the duty to use that degree of care that an ordinarily careful and prudent sensor designer, manufacturer, and seller of such sensors and/or component parts would use under the same or similar circumstances.

91. In breach of this duty, Defendants failed to use reasonable care and skill in the design, manufacture, marketing and distribution of the sensor.

92. Defendants were negligent in one or more of the following ways:

    a.      failing to use reasonable care and skill in the design, manufacture and testing of the incident sensor;

    b.      failing to use reasonable care and skill in the establishment of standards and specifications for the performance and reliability of the sensor;

    c.      failing to adequately test and monitor the reliability of the sensor;

    d.      failing to adequately investigate and inform operators of the aircraft of prior

FILED DATE: 6/24/2019 12:08 PM 2019L006951

instances of sensor malfunction and failure;

e. negligently designed, manufactured, assembled, and sold the aforesaid sensor such that it affected the flight control system that failed to filter out erroneous information, including information about the aircraft's angle of attack;

f. negligently designed, manufactured, assembled, and sold the aforesaid sensor such that it contained a flight control system with event sensors that were subject to becoming blocked and/or obstructed causing them to provide erroneous information about the aircraft's angle of attack;

g. negligently designed, manufactured, assembled, and sold the aforesaid sensor such that it contained a flight control system that had event sensors that erroneously reported a high angle of attack, which caused an unauthorized command and without notice to the flight crew, a nose down movement of the aircraft;

h. negligently designed, manufactured, assembled, and sold the aforesaid sensor such that its flight control system feature that commanded unauthorized dangerous downward maneuver of the aircraft did not allow flight crew adequate time or method to respond and/or override an incorrect downward command initiated by the aircraft flight control system;

i. negligently designed, manufactured, assembled, and sold the aforesaid aircraft such that subject aircraft did not provide a method or means by which to correct improperly-commanded downward movements initiated by the aircraft's flight control system thus not allowing the flight crew a means to timely and safely recover control of the aircraft;

FILED DATE: 6/24/2019 12:08 PM 2019L006951

j.  negligently failed to warn of the above-defects with the subject sensor; and

k.  negligently provided or failed to provide proper and adequate after-sale warning, instructions and/or advise as to the maintenance and repair of the subject sensor.

93. As a direct and proximate result of one or more of the forgoing negligent acts or omissions of Rosemount Aerospace, the subject aircraft crashed, causing fatal injuries to all onboard, including, Decedent YUNINGTYAS UPIEK KARTIKAWATI.

94. TASSYA DIANTI PUTERI, as Special Administrator of the Estate of YUNINGTYAS UPIEK KARTIKAWATI, brings this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180 et seq. on behalf of YUNINGTYAS UPIEK KARTIKAWATI's next of kin.

**WHEREFORE**, Plaintiff TASSYA DIANTI PUTERI, as Special Administrator of the Estate of YUNINGTYAS UPIEK KARTIKAWATI prays for judgment in her favor and against the Rosemount Defendants in a sum in excess of the jurisdictional limits of this Court, together with interest and costs of this action.

## JURY DEMAND

Plaintiff respectfully requests the Court for a trial by jury.

Respectfully submitted this 24th day of June 2019.


**TASSYA DIANTI PUTERI**


**THE WEBSTER LAW FIRM**

By:*/s/ Jason C. Webster*
Jason C. Webster
Attorneys for Plaintiffs

JASON C. WEBSTER
Texas State Bar No. 24033318
6200 Savoy, Suite 150
Houston, Texas 77036
Telephone: (713) 581-3900
Facsimile: (713) 581-3907
filing@thewebsterlawfirm.com

FILED DATE: 6/24/2019 12:08 PM   2019L006951